**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IPSEN BIOPHARMACEUTICALS, INC.,<br>1 Main Street<br>Cambridge, MA 02142,<br><br>              Plaintiff,<br><br>      v.<br><br>XAVIER BECERRA, in his official capacity as<br>SECRETARY OF HEALTH AND HUMAN<br>SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>and<br><br>ROBERT CALIFF, M.D.,<br>in his official capacity as<br>COMMISSIONER OF FOOD AND DRUGS,<br>FOOD AND DRUG ADMINISTRATION,<br>10903 New Hampshire Avenue,<br>Silver Spring, MD 20993,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Ipsen Biopharmaceuticals, Inc. (Ipsen) hereby brings this Complaint against

Defendants Xavier Becerra, in his official capacity as Secretary of the Department of Health and

Human Services (HHS), and Robert Califf, M.D., in his official capacity as Commissioner of Food

and Drugs, head of the Food and Drug Administration (FDA or the agency), and alleges as follows:

1.      This is an action to set aside FDA's unlawful refusal to recognize Ipsen's product

Somatuline® Depot (lanreotide acetate) as a biological product, and the agency's recent approval of a

competing product marketed by InvaGen Pharmaceuticals, Inc., a subsidiary of Cipla USA, Inc.

(InvaGen) under a regulatory pathway that is not available for biological products.

2.      Congress directed FDA to transition over to regulation as a "biological product" (or "biologic," for short) any previously approved drug products that meet the statutory definition of that term, setting a statutory deadline of March 23, 2020 for that transition.

3.      Under the statutory definition, a "biological product" includes any "protein." Under FDA regulations issued just weeks before the March 23, 2020 statutory deadline, the term "protein" was defined to mean "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size." FDA's definition expressly recognized that the amino acid polymer of a protein can be comprised of two or more amino acid chains, each containing 40 or fewer amino acids, provided the chains are "associated with each other in a manner that occurs in nature."

4.      The active ingredient in Somatuline Depot falls squarely within that definition:  It is an amino acid polymer with a specific defined sequence composed of multiple amino acid chains associated with each other in a manner found in nature, and the total number of amino acids among the associated chains in Somatuline Depot exceeds 40 amino acids.

5.      Nonetheless, FDA refused to include Somatuline Depot in the list of products that it transitioned over to regulation as biological products, as required by statute.

6.      FDA recently approved a competing product marketed by InvaGen under a drug regulatory pathway (known as the "505(b)(2) pathway") that is not available for biological products. The approval of that product causes concrete and imminent harm to Ipsen, thus rectifying the standing concerns that caused this Court to dismiss Ipsen's earlier pre-approval Complaint on this issue.  *See Ipsen v. Azar*, Case No. 20-2437 (D.D.C.).  Ipsen's claims are ripe for judicial review.

7.      For all of these reasons, FDA's actions are unlawful, arbitrary, capricious, an abuse of discretion, and otherwise violate the Administrative Procedure Act (APA).

**PARTIES**

8.     Plaintiff Ipsen is a Delaware company with its principal place of business at 1 Main Street, Cambridge, MA 02142.  Ipsen distributes, markets and sells pharmaceutical products manufactured by its affiliates, most principally Somatuline Depot.

9.     Defendant Xavier Becerra is the Secretary of HHS and is responsible for administering and enforcing the Food, Drug, and Cosmetic Act, 21 U.S.C. § 321, *et seq*.  Defendant Becerra is being sued in his official capacity only.  Defendant Becerra maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201.

10.     Defendant Robert Califf M.D., is the Commissioner of Food and Drugs and is responsible for supervising the activities of FDA, an administrative agency within HHS.  Defendant Califf is being sued in his official capacity only.  Defendant Califf maintains an office at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

**JURISDICTION AND VENUE**

11.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331 (federal question), in that this is a civil action arising under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 5 U.S.C. § 702, in that Ipsen is seeking judicial review of an agency action from which it has suffered a legal wrong, has been adversely affected, and has been aggrieved; 28 U.S.C. § 1361, in that this is an action to compel an officer of the United States to perform his duty; 28 U.S.C. §§ 2201–2202, in that there exists between Ipsen and the Defendants an actual, justiciable controversy as to which Ipsen requires a declaration of its rights by this Court as well as injunctive relief to prohibit the Defendants from violating laws and regulations; and 21 U.S.C. § 355(q) and other sources of law, in that the conduct complained of constitutes final agency action.

12.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e) because this is a civil action in which the Defendants are officers of the United States acting in their official capacities and one of the Defendants maintains his office and conducts business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims herein occurred within this judicial district.

13.     Ipsen has standing to bring the present lawsuit because it is suffering and faces additional actual injury as a result of FDA's decisions, as explained more fully below, and because it is within the zone of interest of the relevant statutory and regulatory provisions.

## FACTUAL BACKGROUND

## I.  Statutory And Regulatory Background

### Drug Products

14.     The Federal Food, Drug, and Cosmetic Act (FDCA) provides the statutory framework for FDA's regulatory oversight of drug products.

15.     The FDCA permits three types of applications for a new drug.  At one end of the spectrum, a manufacturer can submit a full New Drug Application (NDA) under Section 505(b)(1) of the FDCA.  21 U.S.C. § 355(b)(1).  A full NDA is a comprehensive application used by brand-name or innovator companies.  It contains reports of scientific studies conducted by or for the applicant, demonstrating that the drug is safe and effective for its proposed use.  After a period of marketing exclusivity and expiration of any applicable patent rights, FDA may approve applications to market generic versions of the innovator drug, so long as they meet the criteria for approval.

16.     At the other end of the spectrum, generic drugs are approved through an Abbreviated New Drug Application (ANDA) under Section 505(j) of the FDCA.  21 U.S.C. § 355(j).  ANDAs do not include new clinical data.  Instead, an ANDA relies on FDA's finding of safety and efficacy for a previously approved drug, which is known as the "reference listed drug."  In other words, the point of

an ANDA is not to independently demonstrate safety or effectiveness, but to establish that the generic product is equivalent to a reference listed drug already known to be safe and effective.  *See* 21 U.S.C. § 355(j)(2).

17.    Between the two extremes of a full NDA and an ANDA lies a third option:  an application submitted under Section 505(b)(2) of the FDCA.  21 U.S.C. § 355(b)(2).  A 505(b)(2) application is a type of NDA and as such the applicant must demonstrate that the proposed drug product is safe and effective.  But a 505(b)(2) applicant does not have to conduct all of the burdensome scientific studies required of a full NDA.  Instead, the 505(b)(2) applicant can show safety and effectiveness by relying, at least in part, on studies that were not conducted by the applicant and for which the applicant does not otherwise have a right of reference.

18.    A 505(b)(2) application generally is used to seek approval of a drug that differs from a previously approved drug product in some way that would preclude an ANDA.  For example, a 505(b)(2) application may seek approval of a drug product that has a different dosage form or materially different inactive ingredients than the reference listed drug.  *See* FDA Draft Guidance for Industry:  Applications Covered by Section 505(b)(2) (October 1999) ("FDA Guidance") at 4.  The applicant can rely on the investigative studies that were performed to obtain FDA approval for the previously approved product, supplemented by whatever information is necessary to demonstrate the safety and effectiveness of the different dosage form or new inactive ingredients.  *Id*. at 3.

19.    Pursuant to Congressional mandate, *see* 21 U.S.C. § 355(j)(7)(A)(i)(I)-(III), FDA lists all approved drugs in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (37th Ed. 2017), also known as the "Orange Book."  Among other things, the Orange Book lists each approved drug product and identifies its active ingredient, proprietary name, dosage form and strength, applicable patents and exclusivity periods (if any), and therapeutic equivalences ratings (if any).  The

5

Orange Book is used by pharmacists, physicians, pharmacy benefit managers, and formulary committees in deciding whether, under applicable state law, a purported generic drug product or, in rare cases, a 505(b)(2) product, may be substituted for the brand name drug.

***Biological Products***

20.    FDA's approval authority is different for *biological products*—products like blood, viruses, and proteins—which are subject to a separate set of statutory and regulatory requirements. The approval of biological products, in contrast to drugs, is governed by the Public Health Service Act (PHS Act).  Under the PHS Act, companies wishing to market a biological product must submit a biologics license application (BLA) to FDA.  The agency will approve a BLA only if it determines that the product, the manufacturing process, and the manufacturing facilities meet applicable requirements to ensure that the product is "safe, pure, and potent."  42 U.S.C. § 262(a)(2)(C)(i).  A BLA under section 351(a) of the PHS Act must be based only on studies conducted by the applicant or on studies for which the applicant has obtained ownership or "rights of reference."  That is, there is no allowance under section 351(a) of the PHS Act for the submission of a BLA that relies on another company's data (absent an express right of reference) or on FDA's approval of another company's product.

21.    There is also no such thing as a "generic" version of a biological product.  Instead, the 2010 Biologics Price Competition and Innovation Act of 2009 (BPCI Act) created a separate abbreviated approval pathway for biological products that are demonstrated to be either (i) "biosimilar" to or (ii) "interchangeable" with an FDA-approved biologic.  42 U.S.C. §§ 262(i)(2), (4).

22.    A biological product is "biosimilar" to the reference product only when it has been shown to be "highly similar" to the reference product *and* when sufficient information has been presented (including clinical data, if needed) to show that there are no clinically meaningful differences between

the biological product and the reference product in terms of safety, purity, and potency.  *Id.*
§ 262(i)(2).

23.    In order to meet the higher standard of "interchangeability," a sponsor must demonstrate
that the product is both biosimilar to the referenced product *and* can be expected to produce the same
clinical result as the reference product in any given patient (and, for a biological product that is
administered more than once, that the risk of alternating or switching between use of the biosimilar
product and the reference product is not greater than the risk of maintaining the patient on the
reference product).  *Id.* § 262(i)(4).  The pathway for obtaining an interchangeability determination
from FDA is more strenuous than that for obtaining approval of an ANDA.  Unlike the ANDA
process, interchangeability requires a separate regulatory step, in addition to approval of the product.

24.    Biological products are not listed in the Orange Book.  Instead, they are listed in a
separate compendium known as the "Purple Book."  The Purple Book constitutes an official listing of
all biological products that have been licensed by FDA, and it includes information about biosimilarity
and interchangeability determinations.  Notably, unlike the Orange Book, the Purple Book contains no
advance listing of patent information for brand name products, because the legal framework for
litigating patents under the FDCA—against generic and 505(b)(2) applicants—is quite different from
the legal framework under the PHS Act for litigating patents against biosimilar applicants.

25.    FDA has approved 33 biosimilars in the 12 years since enactment of the BPCIA, which
speaks to the rigors of the biosimilars pathway.  In that same time period, FDA has made only two
interchangeability determinations, which underscores just how rare these determinations are.

26.    As stated above, there is no 505(b)(2)-type pathway that has been authorized by Congress
for biological products.  A biological product must either be approved under a full BLA (based on

independent data developed or controlled by the applicant), or an abbreviated BLA; there is no in-between or "hybrid" option.

27.    For these reasons, whether a particular product is regulated as a drug or a biological product matters.  Congress thus has given significant attention to the issue.  In 2010, the BPCI Act amended the definition of "biological product" to include a "protein (except any chemically synthesized polypeptide)."  As a result of the 2010 amendment, the statutory definition read:  "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, *protein (except any chemically synthesized polypeptide)*, or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings."  42 U.S.C. § 262(i)(1), eff. Mar. 23, 2010 (emphasis added).

28.    In that same 2010 legislation, Congress also provided that on March 23, 2020—ten years after enactment of the new definition—an approved drug application for a drug product that meets the new definition of "biological product" shall be "deemed to be a license" for the biological product. BPCI Act, Section 7002(e)(4).  In other words, drug products meeting the new definition were to be statutorily transitioned over to, and regulated as, biological products as of that date.

29.    Eight years later, FDA commenced a rulemaking process to define the new statutory term "protein."  In a December 2018 Proposed Rule, FDA stated: "To enhance regulatory clarity and minimize administrative complexity, FDA is proposing to codify an approach that distinguishes proteins from peptides based solely on size (i.e., number of amino acids)."  83 Fed. Reg. 63,817, at 63,821 (Dec. 12, 2018).  FDA thus defined the term "protein" to mean "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size."  *Id*.

30.    But the definition did not leave off there.  It also recognized that the amino acid polymer of a protein can be comprised of two or more amino acid chains that are associated with each other.

*Id.* at 63,821.  Notably, FDA did not specify that this association must take the form of a covalent bond, as it has in other contexts.  *See, e.g.*, 21 C.F.R. § 314.3(b) (definition of "active moiety").

31.    Instead, FDA proposed what it called a "bright line" test for determining whether a product formed by associated amino acid chains meets the definition of "protein."  FDA noted that the association between amino acid chains can be in a manner that occurs in nature, or in a manner that is not found in nature.  Only the former is relevant here.

32.    For products associated in a manner that *occurs in nature*, FDA explained:

> When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer would be based on the total number of amino acids in those chains, and would not be limited to the number of amino acids in a contiguous sequence.  In other words, the amino acids in each such amino acid chain would be added together to determine whether the product meets the numerical threshold in FDA's interpretation of the term 'protein' . . . .

83 Fed. Reg. at 63,821.

33.    In late December 2019, Congress amended the statutory definition of "biological product" yet again, this time to remove the exception for chemically synthesized polypeptides.  The statutory definition now reads:  "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, ***protein*** ~~*(except any chemically synthesized polypeptide)*~~, or analogous product . . . ."  *Id.* (eff. Dec. 20, 2019) (emphasis added).

34.    As a result of this most recent statutory amendment, the definition of "biological product" now includes *any* "protein," including those that are manufactured through synthetic systems.  *Id.*

35.    Shortly after the statute was amended again, FDA finalized its proposed rule defining the statutory word "protein."  *Definition of the Term 'Biological Product,'* 85 Fed. Reg. 10,057 (Feb. 21, 2020).

36.     In the Final Rule, FDA acknowledged the recent statutory amendment and proceeded to implement the definition of "protein" set forth in the Proposed Rule.  As a result, FDA's regulations now state:

> A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

21 C.F.R. § 600.3(6).

37.    FDA explained that its new test provides a "bright-line" approach that "will allow both FDA and private industry to avoid spending time and resources on case-by-case determinations for each product."  85 Fed. Reg. at 10,057.

38.    In finalizing the rule, FDA provided a helpful example—through a response to a comment—to show how the rule would operate when a product is composed of smaller chains of amino acids that associate with each other.  Specifically, FDA rejected a commenter's argument that insulin would not count as a protein under the new definition, because it is composed of two amino acid chain subunits—one containing 21 amino acids and the other containing 30 amino acids.  *Id*. at 10,060.  FDA explained that because "these amino acid chain subunits are associated with each other in a manner that occurs in nature, we add the number of amino acids in each amino acid chain together to determine whether insulin is an alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." *Id.*  FDA therefore concluded that insulin was a protein.

39.    FDA also rejected another commenter's request that the agency define those products that are "analogous" to a protein.  *Id.* at 10,061; *see* 42 U.S.C. § 262(i)(1).  The agency noted, however,

that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule." *Id.*

40.   Throughout the rulemaking, FDA made clear that the frame of reference for analyzing whether a product meets the definition of "biological product" is the active ingredient as it exists in the finished dosage form of the product.

41.   In the preamble to the Proposed Rule, FDA explained that the associated amino acid chains "would be added together to determine whether *the product* meets the numerical threshold."  83 Fed. Reg. at 63,821 (emphasis added).  The term "product" for FDA regulatory purposes generally refers to the active ingredient or active substance as it exists in a "finished dosage form."  21 C.F.R. § 314.3 (defining "drug product" as "a finished dosage form, e.g., tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients").

42.   FDA updated its list of biological products to be transitioned to BLAs on March 23, 2020, as required by Congress.  That list—referenced herein as the "List of Transitioned Products"— contained 97 products that FDA believed to qualify for treatment as a biologic.  *See* https://www.fda.gov/media/119229/download.

43.   Somatuline Depot was not among them.

**II.  Somatuline Depot**

44.   Somatuline Depot is approved  for treatment of several rare diseases through extended-release dosing of its active ingredient lanreotide acetate, a molecule that mimics the naturally occurring hormone somatostatin.  *See* Somatuline Depot Package Insert, Section 11.[1]

---

[1] *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/022074s024lbl.pdf (*Package Insert*).

45.   FDA initially approved Somatuline Depot  in 2007 for the treatment of patients suffering from a rare hormonal disorder called acromegaly.  *Id.*  Acromegaly results from a production of excess growth hormone (GH) by the pituitary gland.  FDA subsequently approved Somatuline Depot to treat adult patients with specific types of tumors in the gastrointestinal tract and to help ease symptoms caused by carcinoid syndrome.  *Id.*, Section 1.2, 1.3.

46.   Somatuline Depot belongs to a small but important category of therapeutics referred to as "depot drug products."  Typically, these products involve injection of a drug product under the skin to form a drug reservoir (the "depot") at the site of injection.  The depot then slowly releases the active ingredient over an extended period of time.  For depot products generally, and for Somatuline Depot in particular, the structure that exists or forms within the body is critical, because it is this structure that holds the active ingredient in place.  It must be stable but also devolve over time in a controlled manner to modulate the release of the drug over the course of the weeks-long dosing interval.

47.   Somatuline Depot requires a specially designed prefilled syringe within which the drug product exists as a supersaturated semi-solid solution.  The solution contains a viscous, gel-like substance comprised of lanreotide acetate chains organized into large, tubular structures called nanotubes.  The only measurable inactive ingredient in the product is water.  The product, in the dosage form, would not have the properties of a viscous gel were it not for the long polymeric amino acid chains that exist within, and constitute, the active ingredient within the product.  The syringe is used to inject the semi-solid solution under the skin, where it forms a depot.

48.   The efficacy of Somatuline Depot is attributable to its unique ability to be administered as a semi-solid and to then form a structure in the body that diffuses specific amounts of lanreotide into circulation over an extended period of time with only a single monthly injection.

### III.  FDA's Refusal to Recognize Somatuline Depot as a Biological Product

49.   Somatuline Depot falls squarely within the definition of "biological product" as reflected in the amended statute and in FDA's implementing regulation.  As noted above, the statute provides that all proteins—including, after Congress's amendment, chemically synthesized ones—count as biological products.  42 U.S.C. § 262(i)(1).  And FDA has defined the statutory term "protein" to mean "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size."  85 Fed. Reg. at 10,057.  FDA's definition recognizes that the underlying amino acid polymer of a protein can be comprised of two or more amino acid chains associated with each other in a manner that is found in nature.  83 Fed. Reg. at 63,821.

50.   That is precisely what Somatuline Depot is: an amino acid polymer with a specific defined sequence composed of multiple amino acid chains where the total number of amino acids exceeds 40 amino acids.

51.   The amino acid chains in Somatuline Depot also associate with each other in a manner that occurs in nature.  The interactions between amino acid chains in Somatuline Depot involve the same chemistry and ordering that drives the association of amino acid chains in nature and that governs the assembly of proteins in biological systems.  In natural proteins, the amino acid chains self-assemble into three-dimensional shapes, driven by primary amino acid sequence.  So too with Somatuline Depot, wherein the amino acid chains form a nanotube through the same chemistry and thermodynamic ordering as found in nature.

52.   At the very least, Somatuline Depot is "analogous" to a protein under the statutory definition, both for the reasons set forth above, and because it has the size, structure and complexity to be considered analogous to a protein.  Somatuline Depot thus is entitled to treatment as a biologic.

13

53.    Nonetheless, when FDA updated its preliminary List of Transition Products on December 31, 2019 to reflect the new statutory definition, Somatuline Depot was not on the list.

54.    On February 19, 2020, Ipsen wrote to FDA requesting the prompt addition of Somatuline Depot to the List of Transition Products.  In its comment letter, Ipsen explained that Somatuline Depot falls squarely within the updated definition of "protein" set forth in the Final Rule.

55.    On March 10, 2020, following promulgation of the Final Rule, Ipsen submitted supplemental comments to FDA reiterating its request for treatment as a biological product under the new definitions, and attaching an expert declaration explaining why its product met the new definition.

56.    On the statutory deadline, March 23, 2020, FDA removed a number of products that it deemed to be "biological products" under the new statutory definition from the "Orange Book," the agency's official listing of FDA-approved drug products.  FDA indicated that it was moving these products over to the Purple Book.

57.    On March 24, 2020, FDA finalized its List of Transition Products.  *See* https://www.fda.gov/media/119229/download.  Somatuline Depot was neither listed on the final List of Transition Products nor moved to the Purple Book.  Instead, Somatuline Depot remains listed in the Orange Book, which purports to list drug products that do not constitute biological products.

58.    Over the next few months, Ipsen attempted to persuade FDA that its refusal to regulate Somatuline Depot as a biological product was unlawful.  Nonetheless, on July 31, 2020, FDA denied Ipsen's request.

59.    First, the agency refused to assess the lanreotide acetate polymer in Somatuline Depot in the form it appears in the finished dosage form.  Instead the agency maintained that it would examine the "released lanreotide octapeptide" *in the body*, following administration of the drug, to determine whether it satisfied the definition of a "protein."  FDA Letter dated July 31 at 6.  In doing so, FDA

ignored the plain language of the statute and regulations, as well as a long line of its own precedent, which make clear that the finished dosage form of a drug is what matters. *See* 83 Fed. Reg. at 63,821 (explaining that the associated amino acid chains "would be added together to determine whether *the product* meets the numerical threshold.") (emphasis added); *see also, e.g.*, 21 C.F.R. § 314.3 (defining "drug product" as "a finished dosage form, e.g., tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients").

60.    FDA also concluded that the amino acid chains in Somatuline Depot are not "associated with each other in a manner found in nature."  FDA Letter dated July 31 at 8–12.  FDA did not contest Ipsen's characterization of the manner in which the amino acid chains in Somatuline Depot associate with each other.  Instead, the agency applied a structural and functional test that it had expressly rejected in promulgating the Final Rule. *Id.*

61.    Finally, FDA refused to consider whether Somatuline Depot was analogous to a protein, because according to the agency, products that fail to satisfy the "bright line" test in the rule are automatically excluded from being deemed "analogous to" a protein. *Id.* at 14–15.  That faulty position essentially reads the "analogous to a protein" language right out of the statute; a product either satisfies the definition of protein, or it doesn't.

62.    Following FDA's final decision, Ipsen filed a lawsuit in this court, challenging FDA's decision as unlawful.  The parties filed cross-motions for summary judgment.  The government's brief argued that "[b]efore an ANDA can be approved, another pharmaceutical manufacturer must develop a potential generic version of Somatuline Depot, submit an ANDA, and obtain FDA approval.  See 21 C.F.R. § 314.94.  Ipsen has not alleged whether such an ANDA has been submitted for FDA review, much less whether and when it is likely to be approved." *Ipsen v. Azar*, Case No. 20-2437, Dkt. No. 17 at 14 (D.D.C. Nov. 23, 2020).

15

63.     This court ultimately dismissed Ipsen's Complaint on standing grounds, noting that Ipsen had been unable to allege at that point in time that a competitor had filed an ANDA referencing Somatuline Depot and/or that FDA had approved a generic drug product listing Somatuline Depot as the reference drug. *Ipsen v. Azar*, Case No. 20-2437, Dkt. No. 28 at 16 (D.D.C. Sept. 24, 2021).

**IV.  FDA's Approval of InvaGen's 505(b)(2) Application**

64.     Three months after the court's decision, in December 2021, FDA approved a 505(b)(2) application submitted by  InvaGen for lanreotide acetate injection.  InvaGen's product is supplied in 60 mg/0.2 mL, 90 mg/0.3 mL, and 120 mg/0.5 mL single-dose pre-filled syringes and is indicated for the treatment of patients with Acromegaly and Gastroenteropancreatic Neuroendocrine Tumors (GEP-NETs).

65.     In order to secure approval, InvaGen's 505(b)(2) application referenced clinical data previously submitted by Ipsen for Somatuline Depot.

66.     As noted above, the 505(b)(2) pathway is a unique creature of the regulatory approval process for *drug products*.  A 505(b)(2) application is a New Drug Application, with all the benefits that entails, but it is permitted to rely upon data supplied by a third party—even a competitor like Ipsen. There is no corollary to the 505(b)(2) pathway for *biological products*.

67.     InvaGen's product purports to have the same strength, dosage form and route of administration as Somatuline Depot, and it is virtually identically labeled (save for the omission of an indication for use that is approved for Somatuline Depot but is protected by 7-year orphan exclusivity through September 2024).  Ipsen does not have access to the confidential regulatory file for the InvaGen product, and a public version has not been made available, but it appears that FDA took an "almost" or "failed" generic and pushed it through as a 505(b)(2).  InvaGen therefore benefited from

the wide flexibility of approval through section 505(b)(2), and yet has passed its product off in the market as a generic.

## V.  FDA's Conduct is Unlawful, Arbitrary, and Capricious

68.    FDA's conduct is unlawful, several times over.

69.    First, FDA's refusal to recognize Somatuline Depot as a biological product violates the agency's own statute and regulations.  Somatuline Depot falls squarely within the definition of "protein" set forth in the statute and Final Rule.  The Final Rule sets forth a bright line test.  For amino acid chains that associate in a manner that occurs in nature, if (1) the amino acid polymer product contains two or more amino acid chains, (2) the chains in the product are associated in a manner that occurs in nature, and (3) the total number of amino acids in the associated chains is in excess of 40 amino acids, then the defined sequence is not limited to the number of amino acids in a contiguous sequence.  Rather, the amino acids in the associated chains are added together to determine whether the product meets the size threshold.  83 Fed. Reg. at 63,821.

70.    For Somatuline Depot, the size of the self-assembled structures—based on the cumulative number of amino acid chains in the lanreotide acetate nanotubes—significantly exceeds the numerical threshold that FDA has adopted.  In the finished dosage form, Somatuline Depot consists of highly organized and self-assembled three-dimensional tubular arrangements consisting of thousands of repeating amino acid chains.  The amino acid chains are associated with each other via the same chemistry and thermodynamic ordering that cause amino acid chains to self-assemble in nature.

71.    FDA based its decision on its legally infirm position that the lanreotide acetate polymer in Somatuline Depot must be assessed as it appears in the body, not the finished dosage form.  FDA Letter dated July 31 at 5–8.  To reach that outcome, FDA argued that "it is the octapeptide"—the form

the lanreotide acetate takes when it is "released" in the body following injection—"that confers the pharmacological activity of Somatuline Depot."  *Id.* at 6.

72.    That position is inconsistent with the language of the statute, the regulation, and the Preamble to the Proposed Rule.  The statute uses the term "product" as what must be defined and regulated, and the regulation defines the term "biological product."  42 U.S.C. § 242(i); 21 C.F.R. § 600.3(h).  In the preamble to the Proposed Rule, FDA explained that the associated amino acid chains "would be added together to determine whether *the product* meets the numerical threshold."  83 Fed. Reg. at 63,821 (emphasis added).  And a "product" for FDA regulatory purposes is based on the active substance as it exists in "a finished dosage form."  *See, e.g.*, 21 C.F.R. § 314.3 (defining "drug product" as "a finished dosage form, e.g., tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients").  Indeed, it has long been the agency's position that what matters for regulatory purposes is the drug substance as it appears in the finished dosage form, not in the body.  *See, e.g.*, Brief for Appellees at 1, *Actavis Elizabeth v. FDA,* Case No. 10-5066 (D.C. Cir. 2010).  This interpretation has been recognized and endorsed by the D.C. Circuit.  *See Actavis Elizabeth v. FDA*, 625 F.3d at 764-765 (D.C. Cir. 2010) (endorsing FDA's interpretation of "active ingredient" to refer to the "prodrug" form of a molecule rather than its post-ingestion form).

73.    FDA's position also is premised on its assertion that the amino acid chains in the lanreotide acetate nanotubes are not "associated with each other in a manner found in nature."  FDA Letter dated July 31 at 8–12.  The agency did not contest Ipsen's characterization of the thermodynamic ordering of the amino acid chains in Somatuline Depot—i.e., the manner in which the amino acid chains associate with each other in a step-by-step folding process.  The nanotubes are comprised of peptide dimer building blocks, which self-assemble through noncovalent interactions between the self-

organizing molecules into beta-hairpins anchored by disulfide bonds.  That is a lot of chemistry in one

sentence—but the Court need not wade into it, because FDA does not dispute the manner of association

between the amino acid chains in the lanreotide acetate nanotubes.  85 Fed. Reg. at 10060.

74.    Instead, the agency took the position that the amino acid chains in Somatuline Depot

were structurally and functionally different from those in "naturally occurring proteins," including the

examples that Ipsen had provided in its submission.  See FDA Letter dated July 31 at 9 (dismissing

examples of naturally occurring proteins provided by Ipsen because they involved "multimeric

structures"—that is, structures composed of multiple components—rather than "a single protein"), 10

(noting that both antibodies and insulin involve amino acid chains that associate in a "precise

stoichiometry (i.e., composition and ratio of subunits) that is necessary for the function of the protein.")

(emphases added).

75.    But in promulgating the Final Rule, FDA expressly rejected the relevance of structural

and functional attributes.  As the agency noted in the Preamble to its Final Rule:  "FDA considered

whether to include structural or functional attributes (e.g., folding, provides structural support to

cellular macrostructures, catalyzes a biochemical reaction, transports other molecules, aids in the

folding of other proteins) in its interpretation of the term 'protein,' but determined that this would not

serve to make the line between peptides and proteins any brighter."  85 Fed. Reg. 10057-01 at 10059.

And in the Final Rule itself, FDA noted that it had "considered whether to include structural or

functional attributes in its interpretation of the word 'protein,' but determined that doing so would not

be appropriate."  Id. at 10060.  Instead, the agency chose to focus exclusively on whether the amino

acid chains "associate with each other in a manner found in nature."  Having excluded consideration of

structure and function in favor of a "bright-line rule that provides regulatory certainty," in its Final

Rule, *id.*, FDA cannot permissibly consider structure and function in applying its definition to Somatuline Depot.

76.    FDA attempted to dismiss these examples because they are "multimeric" (i.e., the amino acid polymer is formed by more than one unit). That, too, is in conflict with the Final Rule itself. After all, that was the whole point of the rulemaking: If two or more amino acid chains associate with each other in a manner in which amino acid chains are known to associate in nature, the agency must include those multiple amino acid chains in counting the amino acids—multimeric or not. FDA dismissed multimeric structures as "houses" and insisted that the Final Rule applies only to individual "bricks." *Id.* at 10. But that is not what the Final Rule states; it mandates inclusion of the houses too.

77.    FDA's position that Somatuline Depot is not "analogous" to a protein is also legal error. In declining to define products "analogous" to a protein in the Final Rule, the agency asserted that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule." 85 Fed. Reg. 10,061. FDA reiterated this argument in its July 31 letter, asserting that Somatuline Depot was ineligible for treatment as "analogous" to a protein because it failed the test set forth in the Final Rule. FDA Letter dated July 31 at 14–15.

78.    But if a product satisfies the definition of "protein" set forth in the Final Rule, then it is not an "analogous" product; it is a protein. *See also id.* at 15 (maintaining that a mixture with a protein could be analogous to a protein). The question whether a product is "analogous" only matters if the product is otherwise excluded by the Final Rule.

79.    FDA's decision reads the "analogous product" language out of its governing statute. That is improper. The statutory term must be given meaning, and products that are similar and comparable to proteins are entitled to treatment as analogous to them.

80.    The lanreotide acetate in Somatuline Depot is, at the very least, analogous to a protein.  It exhibits structural properties, including self-assembly, that are found in nature, and particularly in proteins.  In addition, the lanreotide acetate in Somatuline Depot has the size, structure and complexity to be considered analogous to a protein.  FDA's rejection of Ipsen's arguments cannot be squared with the statute, the regulations, or the agency's other statements or past practice

81.    For all of these reasons, FDA erred in refusing to regulate Somatuline Depot as a biological product.

**VI.  FDA's Actions Will Cause Concrete and Imminent Harm to Ipsen and Patients**

82.    Both Ipsen and the patient population will be harmed unless FDA properly recognizes Somatuline Depot as a biological product and withdraws its approval of InvaGen's 505(b)(2) application.

83.    Had FDA transitioned Somatuline Depot to regulation as a biological product, as required by the statute, InvaGen would never have been able to obtain approval of a 505(b)(2) New Drug Application.  As noted above, the 505(b)(2) pathway is only available to drugs.  There is no 505(b)(2) corollary for biological products; an applicant would either have to submit a BLA, and all that entails, or a biosimilar application, and all that entails.

84.    The 505(b)(2) pathway provides unique benefits and flexibility to drug applicants.  A 505(b)(2) application is a New Drug Application, and yet the applicant is permitted to rely upon data submitted by third parties, including competitors like Ipsen.

85.    In addition, the regulatory standards applicable to 505(b)(2) products differ from those applicable to both BLAs and biosimilar applications.  The 505(b)(2) pathway provides degrees of freedom to both the applicant and to FDA.  A 505(b)(2) can be substantially different from the product

it references.  In fact, it *must* be different in some way, because true duplicates of the reference product must be submitted under the ANDA pathway.  21 C.F.R. § 314.101(d)(9); FDA Guidance at 3-4.

86.    In this case, the 505(b)(2) pathway also has provided opportunities for InvaGen to blur the details of approval in marketing the product—opportunities that would not have been available under the biosimilar pathway.  First and foremost, InvaGen has been marketing its product without a brand name and referring to it publicly as a "generic."  Thus, the InvaGen 505(b)(2) product is publicly listed in the Orange Book under the generic name "lanreotide acetate."  The InvaGen product also is being described on price lists such as Red Book, Medispan, and First Databank by reference to its generic name, lanreotide acetate.  Because hospitals and physicians typically use these price lists to order drug products based solely on the generic name, dosage, and price, the InvaGen product is being purchased by many physicians and hospitals in place of Somatuline Depot on the mistaken belief that the InvaGen product is a generic version of Somatuline Depot.

87.    Under state pharmacy laws, drugs that have been determined to be therapeutically equivalent to a reference product typically are automatically substituted for the brand name product whenever a prescription is written for either the brand name (e.g., Somatuline Depot) or the generic name (e.g., lanreotide acetate).  Physicians who see InvaGen's product listed on a price list under the generic name "lanreotide acetate" are likely to order InvaGen's product based on its cheaper price, unaware that FDA has not rated it as therapeutically equivalent to Somatuline Depot.  Physicians will then inject InvaGen's product into patients, unaware that it has not been determined by FDA to work the same way in the human body as Somatuline Depot.  All of this harms Ipsen and potentially puts patients at risk.

88.    All of this would have been impossible had FDA correctly identified Somatuline Depot as a biological product, because all biological products—even biosimilars—are identified with a unique

name.  *See* FDA Guidance for Industry – Nonproprietary Naming of Biological Products (January 2017), available at https://www.fda.gov/files/drugs/published/Nonproprietary-Naming-of-Biological-Products-Guidance-for-Industry.pdf.  FDA has specifically acknowledged that use of the same nonproprietary "proper" name for a biosimilar would incorrectly signal to the market that the products are the same.  FDA Guidance for Industry – Nonproprietary Naming of Biological Products (January 2017) at 6 ("Confusion may also arise among health care providers who, based on their experience with small-molecule drugs and generic versions of those drugs, may incorrectly assume that FDA has determined biological products with the same proper name to be interchangeable.").

89.    In addition, at the urging of InvaGen's parent company (Cipla USA, Inc.), physicians are erroneously reporting InvaGen's product to public and private payers using the same Healthcare Common Procedure Coding System (HCPCS) (pronounced "hic-pix") code as Somatuline Depot for billing purposes.  Currently, Somatuline Depot is the only drug product in HCPCS code (J1930) and thus it is reimbursed by Medicare based solely on its own pricing information.  The descriptor for J1930 is "Injection, lanreotide, 1 mg."

90.    Now that the InvaGen product has launched, Cipla USA, Inc. is urging physicians to bill the InvaGen product to HCPCS code J1930.  In a piece of advocacy entitled "Cipla USA Inc. Lanreotide Acetate Product – Coding Information," Cipla announced:

> Invagen Pharmaceuticals, Inc., an affiliate of Cipla USA, Inc. ("Cipla") received FDA final approval for its Lanreotide Injection supplied in 60 mg/0.2 mL, 90 mg/0.3 mL, and 120 mg/0.5 mL single-dose pre-filled syringes ("Lanreotide") on December 17, 2021, under a New Drug Application ("NDA") submitted under the 505(b)(2) filing pathway. The active ingredient, route of administration, indication, dosages and strengths are the same as that of Somatuline Depot® from Ipsen Biopharmaceuticals Inc.
>
> ***
>
> Cipla will in the immediate next cycle apply to the Centers for Medicare & Medicaid Services ("CMS") to recognize that Lanreotide should be coded under J1930, which code

is for the non-proprietary product name "Lanreotide 1 mg." Based on CMS' HCPCS Decision Tree and applicable guidance, Cipla anticipates CMS assigning Lanreotide to J1930, though Lanreotide is approved under the 505(b)(2) pathway, as it does not "perform a significantly different function than the item(s) currently categorized in HCPCS" and there is not "a significant therapeutic distinction compared to existing coded treatments or products."

91.    Acting in reliance upon this advice, physicians and hospitals are erroneously billing the InvaGen product using HCPCS code J1930.  And because InvaGen's price is lower than the price for Somatuline Depot, healthcare providers will be strongly incentivized to use InvaGen's product over Somatuline Depot in order to capture the difference between the InvaGen price and the payment amount computed by CMS for J1930 using only the average sales price submitted for Somatuline Depot.   *See* CMS ASP Crosswalk files at https://www.cms.gov/medicare/medicare-part-b-drug-average-sales-price/2022-asp-drug-pricing-files.  The foregoing actions present harm to rare disease patients, including oncology patients, who have been deemed by their physicians to need chronic therapy with Somatuline Depot.

92.    None of this would be possible if Somatuline Depot's product were regulated as a biological product.  CMS has placed biosimilar products in a different part of the HCPCS code set.  While drugs and biological products receive "J Codes," biosimilars receive "Q Codes" (i.e., HCPCS codes that begin with the letter "Q").  Thus, the general public would not expect a biosimilar product to be linked to the same HCPCS code as its reference biological product—and the blurring that is occurring in the marketplace due to confusion about the approval pathway for InvaGen's product would not be possible if Somatuline Depot were appropriately regulated by FDA as a biological product.

93.    Ipsen is harmed by the unusual regulatory status of Somatuline Depot in other ways as well.  InvaGen's ability to list its product under the same generic name as Somatuline Depot causes confusion at the patient and physician level about which drug they are receiving.  Patients (and even

physicians) may believe they are receiving Somatuline Depot, but due to the ordering practices of many hospitals may end up with the InvaGen product instead.  Any outcomes relating to differences in efficacy or side effects of InvaGen's product may erroneously be attributed by both patients and physicians to Somatuline Depot, causing reputational harm and driving physicians away from Somatuline Depot.

94.    Again, under the biologics system, FDA differentiates at the level of the non-proprietary name to avoid these outcomes, recognizing that systems used to track adverse events cannot adequately identify manufacturers when products share the same generic name.  *See* FDA Guidance for Industry – Nonproprietary Naming of Biological Products (January 2017) at 5.

95.    The harms caused by FDA's refusal to regulate Somatuline Depot as a biological product will be compounded over time unless vacated by this Court.  On March 10, 2022, Cipla filed a Citizen Petition with FDA, seeking an "A" rating for therapeutic equivalence purposes.  If successful, the "A" rating would entitle Cipla's product to be automatically substituted for Somatuline Depot under state substitution laws.  It also would entitle Cipla's product to be  placed in the same J Code as Somatuline Depot, which would mean that both products would have a single payment rate based on the ASP information reported for both products.

96.    But if Somatuline Depot were appropriately recognized as a biological product, any purported biosimilar would need to go through the rigorous "interchangeability" determination before it could be considered for substitution under state laws governing biological products.  FDA cannot simply bypass the biosimilar and interchangeability pathways by refusing to properly classify products according to their legally defined characteristics.  And as noted, biosimilars are placed in different codes than their reference biological products.  FDA's decision to gloss over these regulatory differences poses harm to Ipsen, patients and the public at large.

97.    All of this will cause concrete and imminent harm to Ipsen.  InvaGen's product was launched on or around February 10, 2022.  Its Wholesale Acquisition Cost (WAC) is priced at 7% below the WAC for Somatuline Depot.  In addition, InvaGen is offering discounts that mean the real cost of the drug is even lower than that.  Almost immediately upon launch, InvaGen's product eroded Somatuline Depot's market share.

98.    Somatuline Depot is Ipsen's single most important product, responsible for 82% of the company's sales.  Annual sales of Somatuline Depot in 2021 were $774 million.  This revenue is critical to Ipsen's ability to invest in pipeline products, including in the oncology area.  FDA's actions threaten Ipsen's ability to fully invest in research and development efforts for these and other applications in the future.  In addition, the economic harms threatened by FDA's actions create the very real risk that Ipsen will be forced to reduce headcount.

99.    Whether judged in terms of sales, profitability, or reputation, Somatuline Depot is crucial to Ipsen's business.  Having that business shifted, improperly, to InvaGen's product is causing – and will continue to cause—significant (and irreparable) loss of market share and financial losses.  The extent of that harm cannot be quantified, and Ipsen will never be able to recover those losses from FDA.

### COUNT I
### (Administrative Procedure Act)

100.    Ipsen realleges, reasserts, and incorporates by reference herein each of the previous allegations as though set forth fully herein.

101.    The APA prohibits FDA from implementing its statutory mandate in a manner that is unlawful, arbitrary, capricious, an abuse of discretion, or contrary to law.  5 U.S.C. § 706(2).

102.  FDA's refusal to recognize that Somatuline Depot is a biological product, its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, and its approval of InvaGen's 505(b)(2) application are unlawful and violate the governing statute and the agency's own regulations, policies, and procedures.

103.  FDA's refusal to recognize that Somatuline Depot is a biological product, its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, and its approval of InvaGen's 505(b)(2) application are arbitrary, capricious, an abuse of discretion, and contrary to law because FDA's conduct conflicts with the agency's own stated policies and long-standing precedent, without adequate explanation.

104.  FDA's refusal to recognize that Somatuline Depot is a biological product, its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, and its approval of InvaGen's 505(b)(2) application are arbitrary, capricious, an abuse of discretion, and contrary to law because these actions reflect a failure of reasoned decisionmaking.

105.  FDA's conduct, as described herein, is not in accordance with federal law and therefore violates 5 U.S.C. § 706(2)(A).

106.  FDA's conduct, as described herein, constitutes agency action in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C).

107.  Both Ipsen and the patient population will be irreparably harmed unless FDA's approval of InvaGen's 505(b)(2) application is vacated and the agency is enjoined from approving any ANDAs or 505(b)(2)s that rely on Somatuline Depot as the reference drug.

108.   There is no mechanism by which Ipsen can be made whole for the injuries described herein.  Ipsen is without an adequate remedy at law because of the unique nature of the harm it would suffer absent injunctive relief.

109.  The intent of Congress will be served by an Order enjoining FDA from approving any ANDAs and/or 505(b)(2) applications that reference Somatuline Depot.  In addition, the public interest will be served by such an Order.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays for the following relief:

A.     A declaration pursuant to 28 U.S.C. § 2201 that FDA's refusal to recognize that Somatuline Depot is a biological product, its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, and its approval of InvaGen's 505(b)(2) application are unlawful, arbitrary, capricious, an abuse of discretion, and contrary to law under the APA and the applicable governing statutes;

B.     A declaration pursuant to 28 U.S.C. § 2201 that FDA's approval of InvaGen's 505(b)(2) application is unlawful, arbitrary, and capricious, an abuse of discretion, and contrary to law under the APA and the applicable governing statutes;

C.     Temporary, preliminary, and/or permanent injunctive relief requiring FDA to recognize Somatuline Depot as a biological product;

D.     Temporary, preliminary, and/or permanent injunctive relief vacating FDA's approval of InvaGen's 505(b)(2) application;

E.     Temporary, preliminary, and/or permanent injunctive relief ordering FDA to refrain from approving any applications  referencing Somatuline Depot based on the assumption that the latter is not a biological product (including but not limited to ANDAs and/or 505(b)(2) applications);

F.     An order awarding plaintiff's costs, expenses and attorneys fees pursuant to 28 U.S.C. § 2412; and

E.   Such other and further relief as the Court deems just and proper.

Respectfully submitted,


__ /s/ Catherine E. Stetson_____
Catherine E. Stetson, D.C. Bar No. 453221
Susan M. Cook, D.C. Bar No. 462978
Eric S. Roytman, D.C. Bar No. 1780980
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com

*Attorneys for Plaintiff Ipsen Biopharmaceuticals, Inc.*

Dated:  March 30, 2022